CITY OF BOSTON *vs.* JOSEPH SANTOSUOSSO & another.

Suffolk.     February 6, 7, 1939. — November 22, 1940.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, & DOLAN, JJ.

*Equity Jurisdiction*, To enforce trust. *Trust*, What constitutes, Constructive. *Conspiracy*. *Agency*, What constitutes, Of fellow conspirator. *Equity Pleading and Practice*, Appeal, Jury issues, Waiver, Rehearing. *Judgment*. *Constitutional Law*, Trial by jury. *Municipal Corporations*, Officers and agents. *Fiduciary*. *Evidence*, Affecting credibility of witness, Competency, Of conviction, Consciousness of guilt, Admission. *Witness*, Impeachment, Credibility. *Error*, Whether harmful.

Upon facts warrantably found, a city was entitled to relief in equity by enforcement of constructive trusts against its mayor and a conspirator with him who severally had received and appropriated to their own use sums of money which the mayor, in breach of his fiduciary duty, had procured to be paid by the city in accordance with and in satisfaction of a judgment entered by agreement against it in favor of a client of the fellow conspirator.

Upon appeal from a final decree following hearing of a suit in equity on the merits, this court did not reconsider questions of law previously decided upon a report of the overruling of a demurrer to the bill.

The mere fact that a judgment against a city, entered in accordance with an agreement for judgment and judgment satisfied, was valid as against the city did not preclude the city from maintaining a suit in equity to enforce constructive trusts against its mayor and the attorney for the judgment creditor where it appeared that the agreement and judgment had been procured by the mayor, acting in violation of his fiduciary duty and in conspiracy with the attorney whereby they procured and severally appropriated to their own uses portions of the amount purported to be paid on the judgment.

The mayor of a city and a fellow conspirator had no constitutional right to have issues framed for trial by jury in a suit in equity to enforce against them constructive trusts arising from their unlawfully having procured money of the city to be paid to them to their own use; nor, on appeal from a denial of motions for such issues, was any abuse of discretion shown.

No harm resulted to the defendant in a suit in equity, and no reversible error was shown, in the exclusion of evidence, which was offered solely to controvert an averment of the bill that the plaintiff conceded was not true and did not rely on at the trial, and which if admitted would not have placed the defendant in a more favorable position.

In a suit to enforce a constructive trust of the plaintiff's money alleged to have been unlawfully appropriated by the defendant in conspiracy with a third person and contended by the defendant to have been received and retained by the third person, it was proper to exclude evidence offered by the defendant of statements by the third person made five months before the alleged conspiracy and unlawful appropriation and tending to show that he expected to get a large sum from the plaintiff.

After the admission without objection of a transcript of certain testimony previously given before a commission and accurately describing certain items in a document before the commission, no prejudicial error appeared in the exclusion of the document itself.

No error appeared in the exclusion of a record of a court, offered to affect the credibility of a witness, purporting to show that he had pleaded guilty to a criminal charge but that the court "did render judgment" therein " and did suspend sentence on" him; no "conviction" within G. L. (Ter. Ed.) c. 233, § 21, was shown.

One of two defendants in a suit in equity, by relying in argument before this court upon evidence which at the trial was limited in application to the other defendant, waived his right to insist upon the limited application.

A conspirator may be the agent of a fellow conspirator in carrying out the conspiracy.

Upon evidence fully reported in a suit in equity against the mayor of a city and the attorney for the claimant in an action against the city, findings were warranted that, following the making of an arrangement between the mayor and a representative of the claimant which included provision for a payment of a sum of money to the mayor, a settlement of the claim upon an agreement for a judgment against the city was approved by the mayor, that in carrying out such arrange-

ment a check of the city for a lump sum, given according to the agreement to the attorney for the judgment creditor, was deposited in the attorney's bank account, that he retained part thereof for his own use and drew a check for another part to the creditor's representative who cashed it and turned its proceeds over in large bills to the judgment creditor's attorney, and that the attorney gave that sum of money to the mayor; and conclusions were warranted that the mayor, in breach of his fiduciary duty, received money of the city for his own use and was chargeable as a constructive trustee at least for the money so received; and that the attorney, because of his participation in the mayor's breach of fiduciary duty, was chargeable as a constructive trustee at least for money he received.

No error appeared in the exercise of his discretion by a judge who denied a motion, based on allegations of newly discovered evidence, for a rehearing of a suit in equity.

BILL IN EQUITY, filed in the Superior Court on January 21, 1937.

The case was heard on its merits by *Fosdick*, J.

*W. P. Murray*, for the defendant Curley.

*F. L. Simpson*, for the defendant Santosuosso.

*E. F. McClennen*, Special Corporation Counsel, for the plaintiff.

FIELD, C.J. This is a suit in equity brought by the city of Boston to compel the defendants Joseph Santosuosso and James M. Curley and each of them "to make full performance of their trust" with respect to a sum of approximately $50,000, alleged in the bill of complaint to belong to the plaintiff and to have been received by the defendants without any consideration therefor, as they well knew.

The bill of complaint — which is fully described in the opinion of this court in *Boston* v. *Santosuosso*, 298 Mass. 175, 177–178 — sets forth the circumstances in which, as the plaintiff alleges, the sum of money referred to in the bill was received by the defendants. It is alleged that the defendant James M. Curley from January, 1930, until January, 1934, was the duly elected and qualified mayor of the city of Boston, and that "In or about November, 1933, the said James M. Curley and the . . . [defendant] Joseph Santosuosso and a representative of Ernest W. Brown, Inc., entered into and agreed among themselves upon a scheme whereby the said James M. Curley by reason of his power

and influence as mayor of the city of Boston would bring it about that certain claims hereinafter described which were the subject matter of suits of the General Equipment Corporation against the city of Boston then pending in the Superior Court for the county of Suffolk and therein numbered 274314 and 275543 would be settled by the payment by the city of the sum of $85,000 to said Joseph Santosuosso and with the agreement between said three that a large part of the proceeds of said money so paid to said Santosuosso — a sum the exact amount of which the complainant is ignorant but which was about $30,000 or $40,000 — would be paid over by said Joseph Santosuosso to said James M. Curley as if for his own use; and about the end of said month of November said three parties put into effect, carried out, and completed, said scheme, and said money was paid over in accordance therewith as hereafter more in detail set out; and thereby the . . . [defendants] became in their own wrong and remain trustees for the city of Boston of approximately $50,000." "After the agreement upon the scheme aforesaid of the . . . [defendants] and said representative of Ernest W. Brown, Inc., and for the purpose of receiving to himself the money aforesaid the . . . [defendant] James M. Curley as mayor approved and brought about the settlement of said suits by causing to be paid to said Joseph Santosuosso from the moneys of the city of Boston the sum of $85,000 and said Santosuosso, in pursuance of said scheme, received said $85,000 and with the assistance of said representative of Ernest W. Brown, Inc., received and retained the sum of $50,000 of which he gave to said James M. Curley a large part, approximately $30,000, with the knowledge and approval of said representative of said Ernest W. Brown, Inc.; and the said Santosuosso out of said $85,000 gave or caused to be given to said Ernest W. Brown, Inc., the sum of $20,000 and to the said representative of Ernest W. Brown, Inc., the sum of $15,000 for compensation." The suits referred to in the bill are identified therein as two proceedings brought on or about January 21, 1932, by said Ernest W. Brown, Inc., "against the said city of Boston in the Superior Court

for Suffolk County in the name of General Equipment Corporation . . . one an action of tort and the other a petition for assessment of damages . . . to recover on account of damages alleged to have been done" to certain premises in Boston. It is alleged that these "two proceedings were tried together in June of 1933 before the court and a jury and a verdict was found therein subject to leave reserved for the said General Equipment Corporation, and thereupon the court, pursuant to leave reserved, set said verdict aside and entered a verdict for the city on or about June 24, 1933, on the ground that there was no liability on the part of the city." It is further alleged that the defendant "Joseph Santosuosso was counsel for said Ernest W. Brown, Inc., in said proceedings." Other allegations need not be recited.

Each defendant filed a demurrer to the bill of complaint based on the grounds, in substance, that no trust was set forth in said bill, that the bill stated no cause for relief in equity, and that the plaintiff had a plain, complete and adequate remedy at law. And each defendant filed a plea in which he alleged a judgment, entered in the action of tort referred to in the bill, as a bar to the maintenance of the present suit. Interlocutory decrees were entered in the Superior Court overruling the demurrers and adjudging the pleas insufficient "but without prejudice to set up the facts therein contained, in the answer." The judge of the Superior Court, by whom the demurrers and pleas were heard, reported to this court the questions raised by said demurrers and pleas and the interlocutory decrees thereon. These interlocutory decrees were affirmed by this court. *Boston* v. *Santosuosso*, 298 Mass. 175.

The defendants filed answers. After the interlocutory decrees above referred to had been affirmed each defendant made a motion in the Superior Court for the framing of jury issues. The motions were denied and the defendants respectively appealed. Thereafter the case was heard by a judge of the Superior Court who made findings of fact and an order for a decree. Each defendant then made a motion for a rehearing. These motions were heard on

affidavits and oral testimony and were denied. The defendant Santosuosso appealed from the interlocutory decree denying his motion for rehearing.

A final decree was entered whereby it was "Ordered, adjudged and decreed that the defendant, Joseph Santosuosso, ought in equity and good conscience to pay to the plaintiff the sum of twenty-five thousand three hundred and four (25,304) dollars, and said defendant is decreed so to do, and costs taxed by the clerk in the sum of seventy-six (76) dollars, and that the plaintiff have execution against the defendant, Santosuosso, for this sum, and interest thereon from this date, and for costs; and that the defendant, James M. Curley, ought in equity and good conscience to pay to the plaintiff the sum of thirty-seven thousand nine hundred and fifty-seven (37,957) dollars, and said defendant is decreed so to do, and costs taxed by the clerk in the sum of seventy-six (76) dollars, and that the plaintiff have execution against the defendant, Curley, for this sum, and interest thereon from this date, and for costs." Each defendant appealed from the final decree.

The defendant Santosuosso filed a request for a report of the material facts upon which the interlocutory decree denying a rehearing was made. Upon this request the trial judge reported: "As to the material facts upon which the motion was denied there is only one. I did not believe either the affidavits or the oral testimony produced in support of the gist of the motion." This defendant also filed a so called "motion for specific findings." The trial judge treated this motion as a request for a report of material facts under the statute (see G. L. [Ter. Ed.] c. 214, § 23), and reported that he had "filed voluntarily a statement of the material facts," that he confirmed that statement and adopted it as his report under the statute and declined to make any further report. The defendant Curley filed a request for a report of the material facts upon which the decree denying his motion for a rehearing was made and the material facts upon which the final decree was made. The trial judge dealt with each aspect of this request in the same manner as he had dealt with like requests of the

other defendant. The defendants' appeals were duly entered in this court. *Boston* v. *Santosuosso,* 302 Mass. 169. The evidence is reported.

Each defendant contends that there was error in (a) the denial of his motion for the framing of jury issues, (b) the exclusion of evidence, and (c) the denial of his motion for rehearing, and contends also (d) that the final decree was wrong on the evidence. The defendant Santosuosso makes the further contentions (e) that "The decree was erroneous as matter of law because on the findings of the court there· was no jurisdiction in equity," and (f) that "The decree against the defendant Curley for $30,000 and against the defendant Santosuosso for $20,000 is erroneous as matter of law because of the judgment in favor of the General Equipment Company." · The defendant Curley makes the further contention (g) that the decree was wrong "in that it adopts the erroneous theory that the receipt of several sums of money, parts of the proceeds of a sum paid in satisfaction of a valid and outstanding judgment against the present plaintiff, constitutes several trusts," and that the "court should have decreed that the remedy of the plaintiff, if it sustained the wrong complained of, was at law, and the bill accordingly dismissed."

Certain basic facts were not within the scope of any of the issues that the defendants sought to have framed and are not now within the field of controversy. These facts are summarized from, or stated in the language of, the report of material facts filed by the trial judge as follows: The defendant Curley was the mayor of the city of Boston. The two proceedings referred to in the bill — an action of tort and a. petition for the assessment of damages under statutory provisions in the event of a taking by eminent domain — were brought by the General Equipment Corporation against the city of Boston. The defendant Santosuosso appeared as counsel for the plaintiff (or petitioner) in these cases. Ernest W. Brown, Inc., "appeared to be the real and the General Equipment Corporation the nominal plaintiff." These cases, with two others brought by Ernest W. Brown, Inc., attorney in fact for insurers of

the General Equipment Corporation, were referred to an auditor. The cases brought by Ernest W. Brown, Inc., "figure no further in this case." After the coming in of the auditor's report the cases brought by the General Equipment Corporation were tried to a jury in the Superior Court. "The cases were fully tried. The auditor's report was in evidence. The jury's verdicts were for the General Equipment Corporation on liability in the tort action and for $129,646.57 damages in each action. The trial judge duly reserved leave to enter verdicts for the defendant city and later granted a motion that such verdicts be entered. To this action the General Equipment Corporation duly excepted. At the time of the transaction . . . referred to as the 'settlement' a bill of exceptions had been seasonably filed but had not been allowed or disallowed."

The city concedes that these proceedings of the General Equipment Corporation were brought in good faith and the trial judge found "that they were, up to about the time of the settlement, prosecuted in good faith. Until the time of the settlement the city had sturdily defended against them. . . . The cases were tried for the city before the auditor and the jury by a member of the staff of the city's corporation counsel. The latter, however, kept constantly in touch with the doings of his subordinate and, after the verdicts of the jury, kept in his own hands the ultimate supervision and control of the progress of the cases." He "conducted himself at all times concerning the cases in question" as "an able, experienced and honorable counselor of this court."

"Following the entry of verdicts for the city on leave reserved there began preparation of the bill of exceptions of the General Equipment . . . [Corporation], and while that was going on there were several conferences of counsel on both sides about settling the cases. Each side apparently thought there was enough uncertainty in the situation to warrant a compromise. In his doings in these conferences and in his advice to the mayor, the defendant Curley, the corporation counsel at all times acted in good faith. The conferences referred to sometimes included the

mayor. No settlement could be made by the city without his authority. He also had many conferences about the cases with the corporation counsel. Until the latter part of November, 1933, the mayor's position was that the cases should go to the Supreme Judicial Court for decision. Nevertheless, the corporation counsel and the defendant Santosuosso kept making settlement propositions and counterpropositions but had not agreed up to November, 1933." The defendant Curley, as mayor, "authorized the settlement of the General Equipment cases for $85,000 and a check of the city for that amount, payable to Joseph Santosuosso, attorney for General Equipment Corporation, and dated November 28, 1933, was turned over to Santosuosso in return for releases and agreements disposing of the cases in court." The trial judge stated in his report of material facts that on the evidence before him he did not find "any element of improvidence in the size of the amount paid in the so called settlement. The same figures could reasonably have been agreed upon if the settlement had been properly brought about. . . . In point of mere formal procedure the transaction correctly followed lines appropriate to a lawful settlement. The city's check for $85,000 served to transfer that amount from its credit at the bank to the credit of Santosuosso who thereupon got legal title to it."

The trial judge incorporated in his report of material facts the following findings of fact, involving in some instances rulings of law. The defendants contend that most, if not all, of these findings of fact were wrong upon the evidence.

"At the time of the pendency of the law cases F. H. Graves represented in Boston the Ernest W. Brown, Inc., and worked with counsel for that corporation and the General Equipment Corporation in the preparation and trial of those cases. He was present at many of the conferences about settlement, including some at which the defendant Curley was present. He was to be paid for his services out of any amount received by the General Equipment Corporation by way of settlement or recovery. His instructions

from his principal were that if the case were settled the principal was to get net $35,000. He was not told by his principal that he was authorized to settle for $20,000. Nevertheless, although he only paid that sum to his principal, it does not appear that the latter was dissatisfied."

"On November 14, 1933, F. H. Graves registered as a guest at the Mayflower, a hotel in Washington, D. C., and remained there until November 16, 1933. During that same period the defendant Curley was a guest at the same hotel. At some time during that period he and F. H. Graves met in the hotel and Graves said to Curley, in substance, 'Can't we settle the General Equipment case?' To this Curley replied, in substance, 'What is there in it for me?' To this Graves answered, '$40,000.' The defendant Curley then said, in substance, 'All right. See Santosuosso and tell him to put it through.' Graves thereupon returned to Boston and told the defendant Santosuosso the substance of the talk with Curley. In a few days the defendant Curley, as mayor, induced thereto by the understanding that a large part of the proceeds were to be paid to him, authorized the settlement of the General Equipment cases" as above set forth. The defendant "Santosuosso deposited the check [received by him as above set forth] in his checking account immediately. He proceeded to draw against it (1) a check for $30,000 payable to Frederick H. Graves, Agent; (2) a check for $20,000 payable to Frederick H. Graves, Agent; and (3) a check for $15,000 payable to Frederick H. Graves, Agent, these three checks totalling $65,000. The balance of $20,000 remained in Santosuosso's account, ostensibly as his fee and reimbursement for his expenditures in the cases. The check for $15,000 Graves deposited in his wife's bank account as his pay for his services in connection with the cases. The $20,000 check Graves turned over to Ernest W. Brown, Inc. The $30,000 check was cashed by Graves in Santosuosso's presence and the entire proceeds were turned over to the defendant Curley by the defendant Santosuosso in accordance with the understanding whereby Curley as mayor authorized the settlement to be made."

The settlement was not "properly brought about, and the facts that the corporation counsel acted in good faith and that the amount paid could reasonably have been arrived at in good faith do not and can not give the settlement anything more than the color of propriety. I do not speculate as to what might have been the eventual amount paid in amicable settlement if wrong doing had not intervened nor upon the question of how the Supreme Judicial Court would have decided the law points if the cases had gone that far. Wrong doing did intervene and made possible and brought about the so called settlement. The defendant Curley, as mayor, had the fiduciary duty to protect the property of the city, as he and the defendant Santosuosso well knew. Until the forming of the understanding among Graves, Santosuosso and Curley which began in the Hotel Mayflower, the mayor was performing properly his fiduciary duty. As a part of that understanding Graves corruptly promised to Curley a gift or gratuity with intent that it should influence his judgment as mayor in the matter of authorizing the settlement of the General Equipment cases. By reason of that promise Curley corruptly authorized the so called settlement that was carried through and later corruptly accepted the $30,000 when it was corruptly given to him by Santosuosso. Authorization of the settlement was a breach of the mayor's fiduciary duty. It is possible that a valid settlement for less money would have been made but for this breach. The city had the right that no settlement made by paying out its money should include in its amount a sum of its money to be corruptly paid to the person whose fiduciary duty it was to conserve its money, no matter how innocent and reasonable appearing such settlement might be and no matter if the corporation counsel was honestly convinced that the settlement was advantageous to the city."

The defendant Santosuosso's "check of $30,000 to Graves, cashed by the latter, gave Graves the legal title to that amount and that title passed to Curley when Santosuosso delivered the proceeds to him. All three knew that the payment of the entire $85,000 had been made possible and

that payment had been made by reason of Curley's breach of his fiduciary duty as mayor. Each, therefore, took in trust for the city the part that went to him. Neither has in any form restored to the city the part that he received. Seasonably after learning of the true nature of the so called settlement the city brought this bill. Never since getting that knowledge had it ratified the so called settlement, which was conceived and carried out in fraud of the city's rights and is not in law or fact a valid settlement nor a lawful use of the city's money for the city's benefit."

"On the evidence I am unable to trace the component parts into which the $85,000 was split any further than I have indicated. Except for the $30,000 paid in currency to Curley the transactions involved merely the transfer of credits. I do not find that the defendant Curley still has the precise currency that was given to him. It appears that the defendant Santosuosso ought in equity and good conscience to pay to the plaintiff the sum of $20,000 with interest from November 28, 1933. The nature of the trust being what it is the interest should be computed at the rate of six per cent per year and not at whatever may have been the going rate, current from time to time in the interest period, received on funds held on express trusts. It appears that the defendant Curley ought in equity and good conscience to pay to the plaintiff the sum of $30,000 with interest from November 28, 1933, also and for the same reason at the rate of six per cent per year."

With respect to the findings above set forth, which the defendants contend were wrong upon the evidence, the trial judge, in his report of material facts, states as follows: "The plaintiff here relies principally for the proof of the conspiracy set out in the bill on the testimony, by deposition and oral, of one Frederick H. Graves. His testimony, if true, makes him out a coconspirator. Before me he admitted having perjured himself before the finance commission in matters vitally material to this case. For both these reasons I have subjected his testimony before me to extremely critical scrutiny and have searched the other evidence with great care for corroboration of all or

of material parts of what he swore to before me and of his affidavit annexed to the bill. At the trial, instead of taking notes, I devoted my energies to attentive observation of the witnesses as they testified in order that I might the more intelligently weigh their testimony. After exhaustive reading and study of the exhibits and the stenographer's transcript of the testimony and colloquies I have come to make the following further findings, having in mind that one does not lightly admit in the jurisdiction that could punish for them a number of specific perjuries in material matters and the giving of a bribe to a public officer." The trial judge also states: "I . . . find consciousness of guilt on the part of both defendants in that each testified falsely before me in material particulars."

We proceed to consider the several contentions of the defendants.

First. The contention of the defendant Santosuosso that "The decree was erroneous as matter of law because on the findings of the court there was no jurisdiction in equity," cannot be sustained.

So far as this question turns upon the allegations of the bill of complaint it was decided adversely to the defendants when the case was here before on a report by a judge of the Superior Court of the questions of law raised by demurrers to the bill of complaint which had been overruled by him (*Boston* v. *Santosuosso*, 298 Mass. 175), and the bill of complaint has not been amended since. It was then held by this court that the bill stated a case for equitable relief. The opinion sets out in considerable detail the allegations of the bill and then states: "The city of Boston . . . points out that the bill of complaint does not seek an equitable remedy for the protection of a legal right, but, as the beneficiary of a trust, seeks to have the trustees who received the legal title to the *res* of the trust (a fund of $50,000) perform the trust. The right of the city of Boston as a *cestui que trust* is preëminently an equitable right, and it arose as soon as the agreement was made and the fund was received by its mayor. When the fund was received under the agreement by the mayor the defendants held the

legal title in trust to pay it over to the city of Boston. The trust obligation was not performed by holding the fund, dissipating the fund or converting the fund into a substituted *res*. The right of the plaintiff is a pure equitable right, and it is immaterial that it may have also a plain, adequate and complete remedy at law. G. L. (Ter. Ed.) c. 214, § 1. *Billings* v. *Mann*, 156 Mass. 203, 204. This court said in *Wilkinson* v. *Stitt*, 175 Mass. 581, 583, 'we have never supposed that the fact that an action for the money had and received would lie at law was sufficient to oust the jurisdiction of the court in equity to compel the delivery of the money . . . [if] the *cestui que trust* elected to proceed in that court.'" Page 180. "On the facts admitted by the demurrers the codefendants made an agreement to get legal title to the city's money when one of them was under the fiduciary duty, as mayor of the city, to protect the property of the city, *Kelly* v. *Allin*, 212 Mass. 327, 331; and the plaintiff's right to relief is not affected by the fact that the city also had a remedy at law." Page 182. In support of this conclusion the court pointed out that a fiduciary relationship is "one in which, if a wrong arise, the same remedy exists against the wrong-doer on behalf of the principal as would exist against a trustee on behalf of the *cestui que trust*" (page 181), and "that one could be joined with the defaulting trustee who had combined or coöperated in the misapplication of the trust funds." Page 181. Though there are references in one or more places in the opinion to the fund received by the mayor, the defendant Curley, it is obvious from the opinion as a whole that the decision related as well to the fund alleged to have been received by the defendant Santosuosso in pursuance of the alleged agreement.

The questions of law decided by this court on the bill and the demurrers require no further consideration. They were fully argued and considered when the case was here before. They must be regarded as settled for the purposes of this case. The ordinary rule applicable to such a situation, as was stated in *Wall* v. *Old Colony Trust Co.* 177 Mass. 275, 279, is "that, except for peculiar reasons, the court will not

hear reargument on questions of law which have been heard and decided before the full court at an earlier stage of the same case." See also *Commonwealth* v. *Millen,* 290 Mass. 406, 408; *Cann* v. *Barry,* 298 Mass. 186. Nothing in the present case requires a departure from this rule. And the findings of fact do not take the case out of the principles established by the decision on the bill and the demurrers. According to these findings there was an agreement to which both defendants were parties and money was received by each of these defendants substantially as alleged in the bill. In accordance with the decision made when the case was here before, on the facts found, there was jurisdiction in equity. One aspect, however, of the contention that there was not such jurisdiction is involved in the contention next to be considered.

Second. The defendant Santosuosso contends that the "decree against the defendant Curley for $30,000 and against the defendant Santosuosso for $20,000 is erroneous as matter of law because of the judgment in favor of the General Equipment Company." And the defendant Curley contends that the decree was wrong "in that it adopts the erroneous theory that the receipt of several sums of money, parts of the proceeds of a sum paid in satisfaction of a valid and outstanding judgment against the present plaintiff, constitutes several trusts," and that the "court should have decreed that the remedy of the plaintiff, if it sustained the wrong complained of, was at law, and the bill accordingly dismissed."

1. No argument has been made that the decree, if proper in other respects, is erroneous for the reason that the defendant Santosuosso is charged with liability for $20,000, and the defendant Curley is charged with liability for $30,000, instead of both defendants being charged with liability for $50,000 or even for $85,000. The point is not open to the plaintiff, which has not appealed. And neither defendant is aggrieved by the decree in this respect, unless on the ground that he was entitled to have a joint liability for the entire amount imposed upon both defendants. Without intimating that there would be any merit in a contention to this

effect, it is enough to say that the court is not required "to discuss matters not regarded by parties as of sufficient merit to admit of serious argument by counsel." *Mullen* v. *Sewer Commissioners of Milton*, 280 Mass. 531, 537.

2. The contention in behalf of the defendants on this branch of the case is, in substance, that the recovery by the plaintiff in this suit in equity of the money found to have been received by the defendants is precluded by a judgment for $85,000, entered in favor of the General Equipment Corporation in the action of tort brought by it against the present plaintiff, and the satisfaction of this judgment by the payment by the plaintiff of $85,000 to the defendant Santosuosso, counsel for the General Equipment Corporation in said action — said $85,000, according to the allegations in the bill and the facts found, being the amount paid by the plaintiff in pursuance of the alleged corrupt agreement to which the defendants were parties, and being the amount out of which was paid the $50,000 received by the defendants — on the ground that, in view of these facts, the money alleged and found to have been received by the defendants was not the property of the plaintiff. Each defendant filed in the Superior Court a plea setting up this defence. In that court interlocutory decrees were entered adjudging the pleas insufficient but without prejudice to set up the facts therein contained in the answer. Upon report to this court these decrees were affirmed, the court saying: "Respecting the pleas, the allegations of the bill of complaint disclose that the scheme which the defendants adopted for getting the trust fund into their possession was to have an agreement for judgment entered against the city, in an action in which a verdict under leave reserved had been entered for the city because there was no liability on the part of the city. The pleas set up this judgment as a bar, both at law and in equity. The defendants in the pending suit were neither parties nor privies to the judgment entered by consent. It is plain that the judgment thus obtained is not *res judicata* in favor of or against the present defendants because neither of them was a party to it." *Boston* v. *Santosuosso*, 298 Mass. 175, 182.

It is argued that this court in the decision on the pleas "misconceived the contention of the defendants as a contention that the judgment was *res adjudicata,* and it merely decided that the judgment was not *res adjudicata,*" though "no contention was there made that the judgment was *res adjudicata,*" or that, at most, the court decided that the pleas were not valid pleas in bar to the bill in all its aspects. It is suggested that the judgment might not be a bar to recovery of damages against the defendant Curley for breach of his fiduciary duty, or even that a plea in bar might not be a proper method of setting up the judgment as a defence to a bill for a return to the plaintiff of the money alleged to have been received by the defendants, and it is urged that, in any event, the previous decision settled nothing more. Furthermore, it is argued that the decree entered was "obviously a decree of return of money found to have been received by the defendants from the General Equipment Corporation and as a part of the money which that company through its authorized agent had received under a judgment which was and is in full force and effect," and that this "is not possible on the authority of *Commonwealth* v. *Harkins,* 128 Mass. 79." We are unable to accept this reasoning.

It is apparent from the extracts from the opinion already quoted and from the opinion as a whole that the court in considering the pleas dealt with the bill of complaint as a bill for the return of money received by the defendants in pursuance of a corrupt agreement, in which they participated, for the settlement of the cases brought by the General Equipment Corporation against the present plaintiff — a bill to charge the defendants as constructive trustees for the plaintiff of money received by them. No reason is suggested in the previous opinion or by argument of counsel, and we perceive none, why the defence set up by the pleas was not the proper subject of pleas in bar. And the decision of the court that the pleas were insufficient must be taken as a decision that the defence set up by the pleas was insufficient to bar recovery by the plaintiff, in accordance with the principles governing constructive trusts, of the money

alleged to have been received by the defendants. Moreover, the facts found by the trial judge at the trial on the merits are in substantial conformity with the allegations of the bill. The effect, therefore, of the decision of the court upon the pleas was to determine that the facts set up thereby as a defence, if proved, would not render erroneous the final decree against the defendants from which they have appealed.

But though the overruling of the pleas as insufficient was in substance a decision adverse to the defendants' contention, it is urged that the language of the court in the opinion indicates that the contention was not considered by the court. This contention, however, was fully argued when the case was here before. And an essential element of a decision adverse to this contention was the proposition stated by the court in the opinion that the judgment was not *res judicata* in favor of or against the present defendants. *Boston* v. *Santosuosso*, 298 Mass. 175, 182. See *McGillvray* v. *Employers' Liability Assurance Corp. Ltd.* 214 Mass. 484, 486–487. While the court did not there point out specifically the bearing of this proposition upon the conclusion reached that the pleas were insufficient, its bearing thereon is fairly inferable from other language of the opinion. We remain content with this conclusion, but add some further explanation thereof. The gist of this suit, according to the allegations of the bill, is a scheme of the defendants whereby the proceedings brought against the present plaintiff by the General Equipment Corporation were settled and part of the money paid by the present plaintiff in such settlement was received by these defendants. Since, on the allegations of the bill, the scheme was a breach of the fiduciary duty of the defendant Curley to the plaintiff, in which the defendant Santosuosso participated, on these allegations, the defendants were bound to surrender to the plaintiff the benefits derived by them from such breach of fiduciary duty — that is, the money received by them. See *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 203 Mass. 159, 202; *Kelly* v. *Allin*, 212 Mass. 327, 331–332; *Rolikatis* v. *Lovett*, 213 Mass. 545, 548; *United Zinc Co.* v. *Harwood,*

216 Mass. 474, 476. It is not material, if true, that the scheme of the defendants was carried out by the entry of a judgment for $85,000 in favor of the General Equipment Corporation against the present plaintiff, and the satisfaction of that judgment by the present plaintiff. Whatever may have been adjudicated by that judgment, as between the General Equipment Corporation and the present plaintiff with respect to the right of the company to the $85,000, the judgment, as was pointed out in the opinion, was not an adjudication in favor of the defendants that the General Equipment Corporation was entitled to the money or any part of it. Even if, as between the General Equipment Corporation and the present plaintiff, the former, by virtue of the judgment, was entitled to the money paid in satisfaction thereof, the present plaintiff would none the less be entitled to recover from the defendants the part of such money that they received by reason of the breach of the fiduciary duty owed to the plaintiff. The plaintiff's right to maintain this suit does not depend upon the judgment's being invalid as between the parties thereto. Compare *Engstrom* v. *Sherburne*, 137 Mass. 153, as explained in *McGillvray* v. *Employers' Liability Assurance Corp. Ltd.* 214 Mass. 484, 486–487. And this suit is not an attempt, as between these parties, to impeach the judgment collaterally. Compare *Joyce* v. *Thompson*, 229 Mass. 106. Moreover, this suit is not governed by the decision in *Commonwealth* v. *Harkins*, 128 Mass. 79, relied on by the defendants. It was held in that case, by a closely divided court, merely that obtaining money on a judgment obtained by false pretences did not constitute the offence of obtaining money by false pretences. The false pretences were too remote. The breach of fiduciary duty owed to the plaintiff alleged by the bill in the present suit was not too remote to charge the defendants as constructive trustees for the plaintiff of the money obtained thereby, even if the judgment was entered as alleged in the plea.

The present case resembles in principle *Kelly* v. *Allin*, 212 Mass. 327, and *McGillvray* v. *Employers' Liability Assurance Corp. Ltd.* 214 Mass. 484. In each of these cases

the defendant had wrongfully caused a judgment to be entered in the plaintiff's case. The former case was a suit in equity to require the defendant to account for property obtained by him in breach of his fiduciary duty to the plaintiff. The court said (page 332): "The plaintiff's right to relief is not affected by the fact that she had a remedy at law, or possibly might have had the entry of judgment vacated and the action brought forward. It was for her to elect which remedy she would pursue. It is immaterial whether the plaintiff had a good cause of action against . . . [the defendant in the case in which the judgment was entered] or not. The defendant [in the suit in equity] caused the action to be disposed of for his benefit, in the manner in which it was disposed of, and he must account for what he has received." In the latter case the court, referring to the *Kelly* case and to the case then before the court, said (page 487): "In neither case could the defendant set up as a defense the judgment to which he was neither party nor privy, but which he had caused to be entered for his own ends and in fraud of the rights of the plaintiff. To hold otherwise would be to allow a gross injustice to be perpetrated under the forms of law, and to say that the law was powerless to prevent its own prostitution."

Third. There was no error in the denial of the motions of the defendants for the framing of issues for trial by jury.

The defendant Curley sought to have framed for trial by jury the following issues: (a) "Did the defendants agree with each other that the defendant Curley by reason of his power and influence as mayor of the city of Boston would bring about the settlement of the actions of the General Equipment Corporation against the city of Boston, mentioned in the bill of complaint, and that payment should be made to said Curley for so doing out of the proceeds of such settlement?" and (b) "If the answer to the previous issue is in the affirmative, what sum, if any, was so paid to the defendant Curley?" The issues that the defendant Santosuosso sought to have framed included the first of these issues and also issues, in substance, as to (c)

whether the defendant Curley brought about the settlement of the proceedings referred to and the payment by the city of the sum of $85,000 to the defendant Santosuosso in pursuance of any such scheme or agreement, (d) whether the defendant Santosuosso paid to the defendant Curley any sum out of money received by him from the city of Boston in settlement of said proceedings and, (e) if he made such a payment, what was the amount thereof?

1. Neither of the defendants had a constitutional right to a trial by jury of any of these issues.

It was decided when the case was here before on the demurrers and pleas that the "right of the city of Boston as a *cestui que trust* is preëminently an equitable right," that when "the fund was received under the agreement by the mayor the defendants held the legal title in trust to pay it over to the city of Boston," and that the "right of the plaintiff is a pure equitable right, and it is immaterial that it may have also a plain, adequate and complete remedy at law." *Boston* v. *Santosuosso,* 298 Mass. 175, 180. This question requires no reconsideration. See *Wall* v. *Old Colony Trust Co.* 177 Mass. 275, 279. Everything said in the present opinion is in accord with the decision then reached. Furthermore, in *Commissioner of Banks* v. *Harrigan,* 291 Mass. 353, 355, it was said that "whether in any particular case the right to a trial by jury is preserved [by art. 15 of the Declaration of Rights of the Constitution of this Commonwealth] depends upon the question whether the subject matter of the cause of action is one pertaining to equity jurisprudence as generally understood in England and Massachusetts at the time of the adoption of the Constitution. The jurisdiction over breaches of trust is one of the earliest branches of equity. The preservation and enforcement of trusts, the ascertainment of violations of duty respecting the management and execution of trusts, and the establishment of the extent of injury caused by infraction of fiduciary obligations, whether they arise out of express or implied, direct or constructive trusts, constitute a familiar division of chancery jurisprudence." See also *Parker* v. *Simpson,* 180 Mass. 334, 351–352, 355.

The subject matter of the cause of action in the present suit is clearly within the equity jurisdiction here described where there is no absolute right under the Constitution to trial by jury. *Boston* v. *Dolan*, 298 Mass. 346, 355.

2. The defendants contend, however, that even if — as we hold — they had no absolute right under the Constitution to a trial by jury, the trial judge, in the exercise of sound judicial discretion, should have framed issues for such a trial and, consequently, that the denial of the motions was error. Undoubtedly issues may be framed for trial by jury in an equity case where there is no absolute right under the Constitution to such a trial. See G. L. (Ter. Ed.) c. 214, § 36. *Pappathanos* v. *Coakley*, 263 Mass. 401, 406. But whether such issues shall be framed is primarily within the discretion of the trial judge, though his exercise of such discretion is reviewable by this court on appeal. *Boston* v. *Dolan*, 298 Mass. 346, 355. The principle governing his action in such a matter, as stated in *Shapira* v. *D'Arcy*, 180 Mass. 377, 379, is that "issues are framed for a jury whenever from the nature of the case and from the facts in dispute it seems that such a trial will best serve the interests of justice." And the principle governing action by this court on appeal from such discretionary action of the trial judge — as in other instances of appeal from discretionary action in equity — is that "error of law or fact must be shown by the record on appeal, in order that the discretionary action may be reversed," and even "though the basis for the action appears fully in the record on appeal, some weight should be given to the exercise of discretion by the court below." *Long* v. *George*, 296 Mass. 574, 579.

No error of law or fact justifying reversal of the action of the trial judge in denying the motions is shown by the record on appeal. The record discloses that the motions were denied "after hearing" by a judge of the trial court — other than the judge before whom the case was tried on its merits. But the record does not disclose what facts, if any, were shown, by affidavit or otherwise, at that hearing bearing on the question whether a trial of the case before the court or before a jury would "best serve the interests of justice."

See *Fay* v. *Vanderford*, 154 Mass. 498, 499; *Shapira* v. *D'Arcy*, 180 Mass. 377, 379; *Culbert* v. *Hall*, 181 Mass. 24, 26; *Pappathanos* v. *Coakley*, 263 Mass. 401, 406. Obviously error in the denial of the motions for jury issues cannot be predicated upon evidence introduced or facts shown at the trial of the case on the merits, though we do not intimate that anything then shown indicates that the case was one in which issues should have been framed. And the pleadings that were before the judge who heard the motions — even considered apart from any fact that may have appeared at the hearing thereon — do not demonstrate that the motions were denied wrongly. These pleadings show that the basic right involved was of an equitable rather than of a legal nature. *Parker* v. *Simpson*, 180 Mass. 334, 355–356. *Lascelles* v. *Clark*, 204 Mass. 362, 377. They raised issues of fact not included among those stated in the motions. Questions of law were involved in some of the issues of fact raised by the pleadings. The trial judge might reasonably have concluded that, on the case made by the pleadings, the issues sought to be framed were not so free from complexity or so clearly separable from other issues that a trial of a part of the case by a jury and a part thereof by the court would not result in confusion, or that the entire case could not be "more easily and satisfactorily settled in a trial according to equity practice." See *Commissioner of Banks* v. *Harrigan*, 291 Mass. 353, 357. See also *Shapira* v. *D'Arcy*, 180 Mass. 377, 379; *Lascelles* v. *Clark*, 204 Mass. 362, 376, 377.

Fourth. Each of the defendants has argued certain exceptions taken by him to the exclusion of evidence at the trial of the case on the merits. We now consider these exceptions.

1. Each defendant offered in evidence, and the judge excluded, the transcript of the evidence in the cases brought by the General Equipment Corporation against the city of Boston. There was an allegation in the bill of complaint in the present case, denied in the answer of each defendant, that "There was in fact no liability on the part of the city of Boston for the damages sought in said two proceedings." It appeared indisputably in the present case that in the previous cases verdicts for the defendant were

entered by the trial judge under leave reserved, but that exceptions to the entry of such verdicts were pending up to the time of the settlement of the cases so that there was no final decision thereof. The purpose for which the transcript of evidence was offered in evidence was to show that the allegation of the bill above quoted was untrue, or, at least, that the cases brought by the General Equipment Company were not "groundless," and inferentially that there was less probability that the settlement was improperly brought about than if there had been no liability upon the part of the city, or the cases had been "groundless." No evidence was offered by the plaintiff in support of this allegation of the bill or tending to show that these cases were "groundless." The plaintiff conceded at the trial of the present case that the previous cases were brought in good faith and also that the contention, made after the verdicts for the defendant were entered, that the entry thereof was error, was made in good faith.

The findings of the trial judge in the present case contained the following recitals: "The city concedes that these actions of the General Equipment Corporation were brought in good faith and I find that they were, up to about the time of the settlement, prosecuted in good faith. . . . The sixth paragraph of the bill states: 'There was in fact no liability on the part of the city of Boston for the damages sought . . . etc.' I did not try the merits of the action of tort and of the petition in the trial of this bill before me. Establishment of the truth of the allegation seems to be unnecessary. If the settlement of those cases at the stage of proceedings described in the bill and as I have found it was procured by means of the conspiracy alleged in the bill then that is enough to warrant a finding of wrong doing by the defendants here which would be sufficient basis for a decree in favor of this plaintiff. If the settlement was innocently brought about the question of the city's liability in those cases is immaterial. If it be thought to have materiality on the question of fact of the existence or nonexistence of the conspiracy alleged then I find that the question of the city's liability is so conjectural

as not to have been at all influential in my arrival at findings. The jury's verdict, if it ought to have stood, settled the facts. Until the Supreme Judicial Court should have decided the law questions the question of liability would not be finally decided. I have not attempted to determine what that decision would have been. . . . On the evidence before me I do not find any element of improvidence in the size of the amount paid in the so called settlement. The same figures could reasonably have been agreed upon if the settlement had been properly brought about. . . . I do not speculate as to what might have been the eventual amount paid in amicable settlement if wrong doing had not intervened nor upon the question of how the Supreme Judicial Court would have decided the law points if the cases had gone that far."

The above recital by the trial judge — which must be taken to be an accurate recital of the manner in which he dealt with the case — discloses that the admission in evidence in the present case of the transcript of the evidence in the previous cases would not have placed the defendants in any more favorable position, either for the purpose of the decision of the case by the trial judge or for the purpose of review of such decision by this court on appeal, than the position in which they were actually placed by the trial judge. Without discussion of the admissibility or inadmissibility of the transcript of evidence it is sufficient to say that the defendants were not harmed by its exclusion. For a like reason the exclusion, subject to the exception of the defendant Curley, of an offer of proof that evidence of negligence on the part of the city of Boston was admitted in the General Equipment Corporation cases was not harmful to this defendant.

2. The defendant Santosuosso makes a further argument in support of the exception to the exclusion of the transcript of evidence as if it was an exception to the exclusion of the record in one, at least, of the General Equipment Corporation cases on the docket of the trial court. He contends that this record was admissible to show the entry in the case of a judgment for $85,000 in favor of the

General Equipment Corporation and the satisfaction of such judgment, and contends that such a judgment and the satisfaction thereof preclude recovery by the plaintiff in the present case. It is not controverted that the previous cases were settled for the amount of $85,000, and that this amount was paid by the city of Boston to the defendant Santosuosso as counsel for the General Equipment Corporation. The present contention is based on the form of disposition of one of the cases on the docket of the trial court. No such exception as that here argued was saved by this defendant. And a somewhat similar exception saved by the defendant Curley has not been argued. However, for reasons previously stated in this opinion in the discussion of the defendants' pleas, there is no merit in the contention that such a judgment and the satisfaction thereof would preclude recovery by the plaintiff in the present case.

3. The defendant Curley excepted to the exclusion of the question asked of the witness Cohen, the attorney who tried the General Equipment Corporation cases for that company as plaintiff, as to what he communicated orally to Silverman, the corporation counsel of the city of Boston, with respect to the right of the then plaintiff to recover in those cases. This defendant also excepted to the exclusion of a question asked of said Silverman as to whether he thought the eminent domain rights of the then plaintiff, involved in one of the cases, were preserved by statute. The answers to these questions could have had no relevance to the present case unless upon the issue of the meritorious nature of the previous cases or upon the issue of the good faith of said Silverman in connection with the settlement thereof. We do not intimate that the evidence was relevant or admissible on either of these issues. But, in any event, its exclusion was not harmful to the defendants in view of the recital of the trial judge above set forth in the discussion of the exclusion of the transcript of evidence and in view of the finding of the trial judge — which is not plainly wrong — of good faith on the part of said Silverman in his conduct in connection with these cases.

4. The question whether the defendant Curley received $30,000 through the defendant Santosuosso out of the $85,000 paid by the plaintiff in settlement of the General Equipment Corporation cases is an important issue in the case. As against the plaintiff's contention that this money was so received the defendants contend that it was retained by Frederick H. Graves. In an attempt to support this contention one Whitcomb, senior, called as a witness by the defendant Santosuosso, was asked to tell what the conversation was that he had with Frederick H. Graves in June, 1933, and an offer was made to prove that, at that time, Graves, in response to an inquiry by the witness as to Graves's accounting for money received by him, said to the witness that he was interested in a suit against the city of Boston from which he expected to get $40,000 or $50,000 and he would then be able to take care of the obligations in question. This evidence was offered to show that Graves had the expectation to which he referred and, inferentially, that Graves was then in financial need. It is doubtful whether this inference would be warranted. But, in any event, the evidence was excluded rightly.

This evidence was hearsay so far as the truth of the statement made by Graves was concerned and was not admissible as an admission by him since he is not a party to the present case and, so far as appears from the evidence, was not, in June, 1933, a coconspirator with either or both of the defendants. Moreover, the mere fact that Graves made this statement, apart from its truth or falsity, had no tendency to show that he was in financial need or that he had in mind any scheme for obtaining money from these cases, either with or without the participation therein of either or both of the defendants. Cases cited by the defendant Curley, in which statements made by parties to litigation tending to show their states of mind were admitted, are distinguishable. Finally, the statement of Graves, offered in evidence, was not admissible as a prior statement by him inconsistent with his evidence previously introduced in the present case in the form of an answer to an interrogatory affirming the truth of his affidavit at-

tached to the bill of complaint — evidence that is described more fully later in this opinion. The evidence offered tended merely to show a difference between expectation and realization. Within the meaning of the rule permitting the admission in evidence of prior inconsistent statements of a witness to discredit his evidence (see *Liddle* v. *Old Lowell National Bank*, 158 Mass. 15, 16), the statement by Graves of his expectation in June, 1933, of receiving $40,000 or $50,000 from a suit against the city of Boston is not inconsistent with the statement in his affidavit that in November, 1933, out of money paid in settlement of the General Equipment Corporation cases, he received $15,000, and $30,000 went to the defendant Santosuosso to be given to the defendant Curley, or with any other statement in the affidavit.

For like reasons there was no error in the exclusion of evidence of the same conversation sought to be introduced through one Whitcomb, junior, also called as a witness by the defendant Santosuosso.

5. The defendants introduced in evidence, without objection, through the official stenographer of the finance commission of the city of Boston, portions of the transcript of the testimony, at hearings before the commission, of Frederick H. Graves. It appeared therefrom that, in the course of this testimony, questions were asked of Graves with reference to a document, obviously before the commission, relating to his return to Ernest W. Brown, Inc., of disbursements made by him in the General Equipment Corporation cases. He was shown the document and acknowledged the signature thereon and some, at least, of the handwriting thereon to be his. He was questioned with respect to certain items therein, including in some detail disbursements purporting to have been made by him for taking four officials of the city of Boston to Washington at the suggestion of the defendant Curley. He testified that he made a return of such disbursements as were described in the questions, but that such return was false. The stenographer identified a certain photostatic document as the copy of the expense account with respect to which Graves was examined before the

finance commission. The defendants offered this document in evidence and, upon objection by the plaintiff, it was excluded. Since the items with respect to which Graves testified were described in the transcript of his testimony, as read by the stenographer, and there was no suggestion that this description was not accurate, it does not appear that the defendants were prejudiced by the exclusion of the document itself. In this posture of the case it is unnecessary to consider the general question of the admissibility of evidence that Graves made such a return of disbursements and that it was false. Moreover if — as we need not decide — any exception to the exclusion of this document was saved by the defendant Santosuosso, it has not been argued by him and is treated as waived so far as he is concerned.

6. Frederick H. Graves, testifying as a witness, was asked on cross-examination by counsel for the defendant Curley whether he was "the same Fred H. Graves who pleaded guilty to a charge of larceny in the Supreme Court in the city of Schenectady, New York." The question was not answered. There was offered, in behalf of both the defendants, the record of said Supreme Court in which it appeared with respect to one Fred H. Graves that "he having been duly arraigned upon said indictment and plead guilty, to Grand Larceny First Degree . . . the said Court thereupon . . . [on March 2, 1926] did render Judgment herein and did suspend sentence on the said defendant." The question and the record were excluded and both defendants excepted.

There was no error. By G. L. (Ter. Ed.) c. 233, § 21, it is provided that the "conviction of a witness of a crime may be shown to affect his credibility," with certain exceptions. This statute applies to a conviction in a court of another State. *Rittenberg* v. *Smith*, 214 Mass. 343, 346–347. But there must be a "conviction." And whatever this word may mean in other connections (see *Commonwealth* v. *Lockwood*, 109 Mass. 323), in this statute it imports a sentence. In *Karasek* v. *Bockus*, 293 Mass. 371, 372, it was said that "only a sentence after a plea of guilty or a trial constitutes a 'conviction' within that statute," and in *Attor-*

*ney General* v. *Pelletier*, 240 Mass. 264, 310–311, it was said that "the word 'conviction' in said § 21 implies 'a judgment and sentence of the court upon a verdict or confession of guilt.' . . . 'Nothing less than a final judgment, conclusively establishing guilt, will satisfy the meaning of the word "conviction" as here used.'" Moreover, it was said in *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 19, that sentence is "final judgment in a criminal case." See also *Manke* v. *People*, 74 N. Y. 415, 424; *People* v. *Bradner*, 107 N. Y. 1, 11. The record does not show that any sentence was imposed. On the contrary, it shows that sentence was suspended. Such a record is not susceptible of the interpretation that sentence was imposed and execution thereof suspended — something materially different. See *Commonwealth* v. *Carver*, 224 Mass. 42, 44; *People* v. *Ottaway*, 247 N. Y. 493, 495. Since there was no "conviction" within the meaning of the governing statute it is unnecessary to consider whether, if there had been such a conviction on March 2, 1926, the time within which it could have been shown in evidence had expired, according to the limits of time fixed by the exceptions in G. L. (Ter. Ed.) c. 233, § 21, when the present case was tried in 1937.

Fifth. The contention of the defendants that the final decree was wrong on the evidence cannot be sustained.

1. Since this is an appeal from a decree in equity with a full report of the evidence the court reviews fact as well as law. But, in accordance with a settled rule that has been stated frequently, where the correctness of a decree importing findings of fact by the trial judge or of specific findings of fact made by him depends wholly or in part upon the credibility of witnesses testifying before him, and the weight to be given to their testimony, due weight must be given to his findings. See *Bratt* v. *Cox*, 290 Mass. 553, 557–558; *Trade Mutual Liability Ins. Co.* v. *Peters*, 291 Mass. 79, 83–84; *Malden Trust Co.* v. *Brooks*, 291 Mass. 273, 279; *Harding* v. *Studley*, 294 Mass. 193, 194; *Culhane* v. *Foley*, 305 Mass. 542, 543. "When this court is asked on appeal with full report of all the evidence to revise the findings of the trial judge, it is 'only in a very clear and excep-

tional case that this can be done, when the court of first instance has seen and heard the witnesses.' *Thomas* v. *Beals*, 154 Mass. 51, 52.'' *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 407–408. As was said in *Berman* v. *Coakley*, 257 Mass. 159, 162, ''The question to be decided is not what the opinion of the full court might be as to the facts on the printed record alone, but whether it can rightly be said that the findings made by the judge who saw the witnesses and heard them testify are plainly wrong.'' This rule of decision is applicable to the present case. Though it is true that a material part of the evidence on which the plaintiff relies, including an answer to an interrogatory by Frederick H. Graves, was documentary, Graves also testified as a witness before the trial judge who, consequently, was in a better position than are we to pass upon his credibility, even with respect to his documentary evidence, and other witnesses, including both defendants, testified before the trial judge either in defence or in rebuttal.

2. The case is somewhat complicated by the fact that some evidence was admitted against one defendant only and cannot be considered against the other defendant, and some evidence was admitted only for the purpose of contradiction and cannot be considered as affirmative evidence in support of allegations of the bill. Questions of the propriety of such limitations upon the use of evidence or of the exclusion of evidence offered by the plaintiff cannot be raised here by the plaintiff since it has brought no such questions before us either by appeal or by bill of exceptions.

3. There is no controversy as to the facts respecting the proceedings in court including the settlement of the cases. This settlement was consummated on November 28, 1933, by the turning over to the defendant Santosuosso of the check of the plaintiff city for $85,000, payable to him as attorney for the General Equipment Corporation. The controversy relates to the manner in which this settlement was brought about and to the disposition of a part of the proceeds of such settlement. The plaintiff contends (a) that the settlement was brought about through a corrupt arrangement to which the two defendants and Frederick

H. Graves were parties, and (b) that in pursuance of this arrangement at least $30,000 of the $85,000 paid by the city to the defendant Santosuosso in settlement of the cases went to the defendant Curley. Upon these two issues the parties are in sharp controversy. The two issues are interdependent and evidence bearing upon each of them has some bearing upon the other.

4. The issues in controversy are narrowed by the following findings of the trial judge which are not plainly wrong. The judge states expressly that he did "not find any element of improvidence in the size of the amount paid in the so called settlement." And he found affirmatively that in "point of mere formal procedure the transaction correctly followed lines appropriate to a lawful settlement." The procedural matters were attended to in behalf of the plaintiff city by the corporation counsel, one Silverman, and the judge found in substance that he conducted himself properly at all times concerning the cases in question. The judge further found that following "the entry of verdicts for the city on leave reserved there began preparation of the bill of exceptions of the General Equipment . . . [Corporation] and while that was going on there were several conferences of counsel on both sides about settling the cases. Each side apparently thought there was enough uncertainty in the situation to warrant a compromise. . . . The conferences referred to sometimes included the mayor," the defendant Curley. This defendant "also had many conferences about the cases with the corporation counsel." The corporation counsel in "his doings in these conferences and in his advice to the mayor, the defendant Curley . . . at all times acted in good faith." The defendant Curley "was performing properly his fiduciary duty" at least until November 14, 1933. According to these findings, which must be taken as true, said Silverman is wholly excluded from any participation in the alleged corrupt arrangement — indeed, there is no allegation in the bill that he participated therein — and the defendant Curley is excluded from any such participation prior to November 14, 1933. The corrupt conduct of the defendant Curley, if there was

such conduct, took place between that date and November 28, 1933, when the settlement was consummated, apart, at least, from the receipt by him of any proceeds of such settlement.

5. It is apparent from the findings that the trial judge — as he properly might — accepted the testimony of Silverman as credible. He testified, in part, referring to a conference with the defendant Curley — which must have taken place between November 16, 1933, and November 28, 1933, as follows: "I went to the mayor's office and told him that Dr. Santosuosso and myself had finally agreed on a figure that I thought was a fair disposition of this case, taking everything into consideration. I told the mayor we had the possibility of a $140,000 payment staring us in the face if the Supreme Court sustained the position of the plaintiff. I told him I saw an opportunity to save approximately $50,000 from the verdict and I thought we ought to settle it. He said he would leave that to me, and I assumed the full responsibility of the settlement of that case, with the approval of the mayor after I had submitted all the facts to him and my judgment in the case." This witness testified further that the defendant Curley did not ask or urge him to make a settlement and did not dominate him in making a settlement. It is apparent, therefore, that if any corrupt arrangement in which the defendant Curley participated was an element in bringing about the settlement such arrangement affected solely the authorization by the defendant Curley, in his capacity as mayor, of a settlement that was not improvident in amount and was recommended in good faith by Silverman as corporation counsel. This is in accordance with the findings of the trial judge.

6. The plaintiff, in support of its contention that the settlement was brought about through a corrupt arrangement in which the defendant Curley participated, argues that up to a time shortly before the settlement was made this defendant was firm in his position that the cases should not be settled, that the plaintiff's (petitioner's) case had not grown in strength, and that these facts tend to corroborate the evidence that the authorization of the settlement by this defendant was the result of a corrupt arrange-

ment in which he participated. The trial judge was not plainly wrong in finding that until "the latter part of November, 1933, the mayor's position was that the cases should go to the Supreme Judicial Court for decision. Nevertheless, the corporation counsel and the defendant Santosuosso kept making settlement propositions and counterpropositions but had not agreed up to November, 1933." Nothing in these or other findings or in any evidence fairly imports that the defendant Curley was so absolutely opposed to settlement of the cases in question that he might not in good faith approve a settlement thereof such as was recommended by the corporation counsel and actually made. That the cases had not grown in strength since the verdicts for the defendant is not, in itself, entitled to great weight. It is common knowledge that frequently a settlement is made after protracted negotiations, though the situation with respect to the case has remained unchanged, except for the approach of the time when the decision must be made whether the case will be settled or litigated. But the facts herein referred to are consistent with the defendant Curley's having been induced to authorize the settlement by a corrupt arrangement such as is found to have been made.

7. The matter of the disposition of the proceeds of the settlement has significance with respect to the case as a whole. We now consider certain aspects of it.

A. The following findings of the trial judge were not plainly wrong and, indeed, are not controverted. The defendant Santosuosso deposited the check received by him in settlement "in his checking account immediately. He proceeded to draw against it (1) a check for $30,000 payable to Frederick H. Graves, Agent; (2) a check for $20,000 payable to Frederick H. Graves, Agent; and (3) a check for $15,000, payable to Frederick H. Graves, Agent, these three checks totalling $65,000. The balance of $20,000 remained in Santosuosso's account, ostensibly as his fee and reimbursement for his expenditures in the cases. The check for $15,000 Graves deposited in his wife's bank account as his pay for his services in connection with the cases. The

$20,000 check Graves turned over to Ernest W. Brown, Inc. The $30,000 check was cashed by Graves in Santosuosso's presence." These findings are supported by the checks that were introduced in evidence, and by testimony of the defendant Santosuosso. They are also in accord with documentary evidence of Graves. The check for $30,000 shows that it was indorsed by Graves, the payee, and paid by the bank on November 28, 1933 — the same day that the plaintiff's check for $85,000 was turned over to the defendant Santosuosso.

B. The question in controversy on this branch of the case is who received the proceeds of the $30,000 check. The trial judge found not only that the check "was cashed by Graves in Santosuosso's presence" — as is not controverted — but also that "the entire proceeds were turned over to the defendant Curley by the defendant Santosuosso." The latter finding necessarily implies that at the time the check was cashed or thereafter the proceeds thereof were received by the defendant Santosuosso. Clearly, as appears from the evidence hereinafter referred to, the evidence was sufficient as matter of law to support this implied finding.

But since this is a case in equity we must consider whether as a matter of fact this implied finding should stand. It is based on conflicting evidence. In support of the finding is the statement of Frederick H. Graves in an affidavit — a copy of which is set out in a footnote[1] — the truth of which

---

[1] "In November 1933, at the Mayflower Hotel in Washington, I had a conversation alone with James M. Curley, then Mayor of Boston. I asked him if we could settle the General Equipment case, and he said how much is there in it for me. I said $40,000, and he said all right, see Santosuosso and tell him to put it through. I told this to Joseph Santosuosso. A settlement was put through. Joseph Santosuosso informed me that it was for $85,000. He drew a check to my order for $30,000 or $40,000 and went with me to the bank and identified me and I cashed the check in his, Santosuosso's, presence and gave the entire proceeds of the check to Santosuosso to give to Mayor Curley. [Said Santosuosso immediately thereafter told me that he did give this money to Mayor Curley.] The next day said Santosuosso gave me two other checks, one for $15,000 which I kept for my compensation, and one for $20,000 which I gave to Mr. Montgomery of Ernest W. Brown, Inc. In addition to the $65,000 accounted for as above said Santosuosso told me that he kept the $20,000 remainder of the $85,000 out of which he paid a part to other attorneys in the case. Said Santosuosso gave me $1,000 for myself in two $500 bills. [Before my conversation above stated with the Mayor I had told Santosuosso that I had been informed by W. J. Montgomery

he affirmed in an answer to an interrogatory, that the defendant Santosuosso "went with me to the bank and identified me and I cashed the check in his, Santosuosso's, presence and gave the entire proceeds of the check to Santosuosso to give to Mayor Curley." Unless the evidence that Graves "gave the entire proceeds of the check to Santosuosso" is disbelieved, the implied finding that the defendant Santosuosso received the entire proceeds of the check must stand. This evidence, however, was squarely contradicted by the defendant Santosuosso. He testified that he went to the bank with Graves at his request and identified him, that Graves cashed the $30,000 check, that the teller gave the money in bills to Graves, and that Graves put it in his pocket. This witness testified that he did not receive the whole or any part of the $30,000 so paid, that he never paid the whole or any part of the money or other sum of money to the defendant Curley, and that he did not give any of the proceeds of the check to Graves or anybody else because he never received any of such proceeds. The witness testified further that after the check was cashed Graves told him that he was going to take the $50,000 to New York. (The witness apparently was referring to the check for $20,000 and the cash amounting to $30,000.) The teller of the bank was called by the plaintiff in rebuttal. His testimony was admitted only for the purpose of contradicting the testimony of the defendant Santosuosso. The teller testified that he handed the money to Santosuosso. And Graves, called also by the plaintiff in rebuttal, testified in direct examination, subject to a like limitation, that the money was given to the defendant Santosuosso in "one package of bills," that the "teller pushed it through the bar, under the bar," that Santosuosso "put it in his pocket" and the witness had not seen it since. This testimony was not changed in substance on cross-examination. Considering this testimony solely for its destructive effect upon the

that the company would accept $20,000 to settle the case.] All the statements contained in this affidavit are true of my own knowledge." Such answer with respect to the portions of the affidavit included within brackets was admitted only against the defendant Santosuosso and was not admitted against the defendant Curley.

testimony of the defendant Santosuosso, it cannot be said by us that the judge was plainly wrong in believing the testimony of the teller and of Graves and consequently disbelieving the testimony of Santosuosso that it contradicted.

The question remains whether the trial judge was plainly wrong in believing — as obviously he did — the evidence in the affidavit of Graves that he (Graves) "gave the entire proceeds of the check [for $30,000] to Santosuosso" when such evidence was not contradicted by any evidence that the trial judge could not rightly disbelieve. Of course mere disbelief of the denial by Santosuosso that he received the money is not the equivalent of affirmative testimony to the contrary. *Caron* v. *Lynn Sand & Stone Co.* 270 Mass. 340, 347. But according to the evidence of Graves, the testimony of the defendant Santosuosso, and other evidence in the case, undoubtedly the defendant Santosuosso, having received, as a result of the settlement, at least $50,000 that naturally belonged to the plaintiff (petitioner) in the General Equipment Corporation cases, or to Ernest W. Brown, Inc., one or both of which corporations he had represented in the cases, drew two checks in the amounts of $30,000 and $20,000 respectively, payable to Graves as agent, and aided Graves in getting the $30,000 check cashed in bills — and the check for $20,000 was certified on the day following the cashing of the $30,000 check. The use of such a large amount of money in bills is so unusual as to cause suspicion, in connection with the other circumstances of the cases — including the drawing of two checks, instead of one, to transfer the aggregate amount of $50,000 — that some improper use was made of the $30,000. See *Attorney General* v. *Pelletier*, 240 Mass. 264, 313–314. And this undisputed transaction was such as would have enabled the defendant Santosuosso to receive the $30,000 in cash while at the same time holding, as the evidence shows, the receipt of Graves for the check for $30,000 of which it was the proceeds. There are no "admitted or irrefutable facts which permit us . . . to say that the . . . [trial judge] was plainly wrong" (*Berman* v. *Coakley*, 257 Mass. 159, 164) in believing the evidence of Graves that the money

was paid to the defendant Santosuosso. Apart from this evidence there is no explanation of the disposition of the proceeds of the check for $30,000 other than the testimony of the defendant Santosuosso which could have been disbelieved by the trial judge. There was no evidence other than this testimony tending to show the possession by Graves after the settlement of any money other than the $15,000 represented by the $15,000 check. And there was uncontradicted evidence in an answer to an interrogatory by the vice-president of Ernest W. Brown, Inc., that the corporation received a certified check for $20,000 and that neither he nor the corporation received any other sums out of the proceeds of the settlement. Unless we can say — as we cannot for reasons set forth later in the opinion — that Graves was so untrustworthy a witness or his evidence of a corrupt arrangement in which the defendant participated so highly improbable as to render his evidence in general unworthy of belief, we must conclude that the implied finding of the trial judge that the defendant Santosuosso received $30,000 out of the settlement — in addition to the $20,000 received by him "ostensibly as his fee and reimbursement for his expenditures in the cases" — cannot be reversed as plainly wrong.

8. The fundamental question in controversy is whether there was a corrupt arrangement in which the defendants and Graves participated for the settlement of the General Equipment Corporation cases.

A. The fact — which for reasons stated we must take to be established — that the defendant Santosuosso received $30,000 from Graves out of the $85,000 paid by the plaintiff city in settlement of the General Equipment Corporation cases in addition to the $20,000 received by him ostensibly for services and disbursements tends to corroborate the evidence that there was a corrupt arrangement in which the defendants and Graves participated. There is no other probable explanation of the receipt of the money by the defendant Santosuosso from Graves.

B. If there was a corrupt arrangement for the settlement of the General Equipment Corporation cases, it began,

according to the findings of the trial judge, with a conversation that took place between Frederick H. Graves and the defendant Curley at the Mayflower Hotel in Washington in the period from November 14, 1933, to November 16, 1933, inclusive. The trial judge found that "On November 14, 1933, F. H. Graves registered as a guest at the Mayflower, a hotel in Washington, D. C., and remained there until November 16, 1933. During that same period the defendant Curley was a guest at the same hotel. At some time during that period he and F. H. Graves met in the hotel and Graves said to Curley, in substance, 'Can't we settle the General Equipment case?' To this Curley replied, in substance, 'What is there in it for me?' To this Graves answered, '$40,000.' The defendant Curley then said, in substance, 'All right. See Santosuosso and tell him to put it through.'" A vital question for determination is whether this finding should stand.

There was undisputed evidence — indeed it is not controverted — that the defendant Curley was at this hotel during this period. Moreover, it appeared from the deposition of the manager of the hotel that Graves was registered there as arriving on November 14, 1933, and departing on November 16, 1933. No reason is apparent for disbelieving this deposition. Some degree of opportunity therefore for such a conversation was afforded. And there is direct evidence that the conversation took place in the affidavit of Graves already referred to. Graves therein stated: "In November 1933, at the Mayflower Hotel in Washington, I had a conversation alone with James M. Curley, then Mayor of Boston. I asked him if we could settle the General Equipment case, and he said how much is there in it for me. I said $40,000, and he said all right, see Santosuosso and tell him to put it through." Graves also was called as a witness by the plaintiff in rebuttal. Much, if not all, of his direct testimony in rebuttal was not admitted against the defendant Curley, and was admitted against the defendant Santosuosso only in contradiction of testimony which Santosuosso had given that did not relate to this conversation's having taken place. Never-

theless, the trial judge saw the witness Graves and heard him testify. Moreover, this witness was cross-examined and on such cross-examination by counsel for each of the defendants he affirmed the truth, in substance, of his statements relating to his conversation with the defendant Curley contained in his affidavit. No objection was made to the admission of the testimony so elicited on the ground that it did not tend to control the evidence in rebuttal (see *Briggs* v. *Humphrey*, 5 Allen, 314, 316), or on any other ground. It was not within the limitation imposed by the trial judge upon the witness's direct testimony in rebuttal and was in the case for all purposes. Furthermore, one Ralph A. Graves, a cousin of Frederick H. Graves, called as a witness by the plaintiff in rebuttal, testified — though his testimony was admitted solely as against the defendant Curley — that "somewhere around the middle of November, 1933," he saw the defendant Curley and Frederick H. Graves in conversation at the Hotel Mayflower, but did not hear anything that was said in their conversation, and that Frederick H. Graves called him over and introduced him to the defendant Curley.

On the other hand, the defendant Curley testified that he did not know Frederick H. Graves, that no person purporting to be Graves talked with him in the Hotel Mayflower, that never in his life had he talked with Graves, and that no person spoke to this defendant in Washington on the subject of the General Equipment Corporation cases. This defendant, being recalled after Ralph A. Graves had testified, testified that he never saw Frederick H. Graves, that said Graves did not introduce him to any person in Washington in the Mayflower Hotel by the name of Ralph I. (*sic*) Graves, or to any person at any time or at any place. Bearing somewhat more remotely on the question whether the conversation described in the finding took place was the testimony of the defendant Curley that the corporation counsel recommended to him that "it was for the best interests of the city to settle that case and save $50,000 by doing it," that he replied that he "accepted that judgment in the case," that no other element entered into his

decision for the acceptance of that judgment except "the knowledge that it was always considered advisable by . . . [him] to settle a case if it could be settled, rather than let it go to a jury; the city is rather a poor litigant in court, has no fund with which to employ members of the jury that private counsel usually has," that he was not "influenced in any way in adopting the recommendation . . . by any expectation of receiving any of the proceeds of the money paid in settlement of that case," and that he did not receive any of the money so paid.

The evidence of Frederick H. Graves, if believed, supports the finding of the trial judge that the conversation between Frederick H. Graves and the defendant Curley described in such finding actually took place. Such a finding imports belief by the trial judge of the evidence of Graves and disbelief by him of much of the testimony of the defendant Curley. And the express statements of the trial judge in his report of material facts are in accord. No conclusion was possible that accepted all the evidence on both sides of the issue as true. But what evidence should be believed is primarily a matter for the decision of the trial judge, and his decision thereon can be reversed by this court on appeal "only in a very clear and exceptional case." *Thomas* v. *Beals,* 154 Mass. 51, 52.

This is not such "a very clear and exceptional case" so far as the conversation is concerned. There are no "admitted or irrefutable facts which permit us . . . to say that the . . . [trial judge] was plainly wrong" in his conclusion with respect to that conversation. See *Berman* v. *Coakley,* 257 Mass. 159, 164. On the contrary, the occurrence of such a conversation was consistent with the facts, as to which there is little or no controversy, that Frederick H. Graves and the defendant Curley were at the hotel in Washington at the time when, according to the finding, the conversation took place, so that opportunity for such a conversation was afforded, and that within two weeks thereafter the cases were settled and the defendant Santosuosso, referred to in the conversation in question, participated in the settlement. Moreover, according to the testimony of

the defendant Curley, up to the latter part of November, 1933, he had maintained the position that the cases should not be settled, so that the authorization of the settlement by him represented a change in his attitude at about the time the conversation was found to have taken place.

Furthermore, the "witnesses were before the judge who made the findings, and he was able to decide, from their appearance and actions in testifying, as to their truthfulness with a greater probability of being right than any one can from a mere reading of their statements in print." *Lindsey* v. *Bird*, 193 Mass. 200, 202. That the trial judge considered the appearance and actions of witnesses in testifying appears from the statement in his report of material facts that at "the trial, instead of taking notes, I devoted my energies to attentive observation of the witnesses as they testified in order that I might the more intelligently weigh their testimony."

Though the testimony of the corporation counsel — which the trial judge apparently believed — that he recommended to the defendant Curley the settlement of the General Equipment Corporation cases corroborates the testimony of this defendant that such a recommendation was made, it cannot be said that the trial judge, upon the consideration which he was in a position to give, not only to the entire testimony of this defendant in the light of the other evidence in the case, but also to his appearance and actions in testifying, was plainly wrong in disbelieving this defendant's denials that the conversation took place, that he was influenced in adopting the recommendations of the corporation counsel by any expectation of receiving any part of the proceeds of the money paid in the settlement, and that he received any of the money so paid. The testimony of this defendant that one of his reasons for authorizing the settlement was avoidance of a jury trial might reasonably have been thought by the trial judge, in view of the position in which the cases stood at the time of the settlement, to be unworthy of belief and to cast doubt upon the credibility of the defendant as a witness. See *Ducharme* v. *Holyoke Street Railway*, 203 Mass. 384, 397; *Peck* v. *New England*

*Telephone & Telegraph Co.* 225 Mass. 464, 466. And we cannot say that other testimony of this defendant might not reasonably have been so regarded. Furthermore, the trial judge properly could consider the interest of this defendant in the result of the present case as affecting his credibility. *Harding* v. *Studley,* 294 Mass. 193, 196. See *Howe* v. *Ripka,* 199 Mass. 359, 360–361.

The arguments against the finding that the conversation took place — in addition to the positive denial by the defendant Curley that it took place — are (a) the general untrustworthiness as a witness of Frederick H. Graves, and (b) the inherent improbabilities in his evidence with respect to the conversation.

There was evidence tending to discredit Frederick H. Graves as a witness. There are some discrepancies between his documentary evidence and his oral testimony. There was evidence of inconsistent statements with respect to the cases in question made by him in testifying at a hearing before the finance commission of the city of Boston. This witness, testifying in the present case, admitted that testimony given by him at the hearing referred to was knowingly false. And the witness admitted on cross-examination that he had rendered a false return of disbursements for expenses to Ernest W. Brown, Inc. The evidence tending to discredit this witness bore upon the weight to be given his evidence, but did not necessarily render it unworthy of belief. This is true even of the prior inconsistent testimony. *Neiss* v. *Burwen,* 287 Mass. 82, 91. See also *Berggren* v. *Mutual Life Ins. Co.* 231 Mass. 173; *Weir's Case,* 252 Mass. 236, 238. And the credibility of the witness was at least primarily a matter for the trial judge in accordance with principles previously stated in this opinion. The manner in which the trial judge dealt with the evidence of Graves appears from the following statement in the report of material facts: "His [Graves's] testimony, if true, makes him out a coconspirator. Before me he admitted having perjured himself before the finance commission in matters vitally material to this case. For both these reasons I have subjected his testimony before me to extremely critical

scrutiny and have searched the other evidence with great care for corroboration of all or of material parts of what he swore to before me and of his affidavit annexed to the bill. . . . After exhaustive reading and study of the exhibits and the stenographer's transcript of the testimony and colloquies I have come to make the following further findings, having in mind that one does not lightly admit in the jurisdiction that could punish for them a number of specific perjuries in material matters and the giving of a bribe to a public officer." These "further findings" include the finding with respect to the conversation. We cannot say that, by reason of the evidence tending to discredit this witness, the trial judge was plainly wrong in giving credence to his evidence that the conversation took place. None of the reasons stated by the trial judge for believing this evidence can be said to vitiate his conclusion. See *Harding* v. *Studley*, 294 Mass. 193, 195.

In determining whether evidence is to be believed, its seeming probability or improbability is to be considered in connection with other matters bearing upon its credibility. The defendants have argued the improbabilities in the evidence of Graves and the likelihood, by reason of such improbabilities, that it is untrue. *Berman* v. *Coakley*, 257 Mass. 159, 164. Doubtless there are somewhat improbable elements in the evidence. But the manner in which persons entering into a corrupt arrangement, such as is charged in the bill of complaint, would probably conduct themselves is speculative. Indeed it is not even to be expected that they would conduct themselves in all respects in the manner that, upon later consideration, would seem to have been the most natural. There are no such improbabilities in the evidence of Graves as "require an overturning of the findings" of the trial judge with respect to the conversation. See *Berman* v. *Coakley*, 257 Mass. 159, 165.

Among the elements in the evidence of Graves particularly relied upon by the defendants as so improbable as to discredit his evidence are the following: that such a conversation took place at a hotel, "in the lobby" with "a lot

of people around" in "the middle hours of the day," as
Graves testified; that the defendant Curley talked about a
corrupt arrangement for the settlement of the cases in ques-
tion with Graves — who, so far as appears, had never
spoken to him before — instead of with the defendant Santo-
suosso who was counsel in the cases and a personal friend
of the defendant Curley; that no mention was made in the
conversation of the amount for which the cases were to be
settled; and that so large an offer for an improper settle-
ment was made in view of the progress of negotiations
toward settlement in a legitimate manner.

It would serve no useful purpose to discuss in detail the
speculative question as to the degree of probability or im-
probability of the various elements in the evidence of
Graves. However, some matters relevant to this question
are here mentioned. The place of the conversation as
stated in the evidence is not beyond the bounds of proba-
bility — it was not a wholly unnatural place for such a
conversation to occur. Undoubtedly conversations on
important matters may occur in such places. According to
the evidence of Graves, he and not the defendant Curley
took the initial step toward a corrupt arrangement, so that
the defendant Curley did not select the person with whom
he would talk about it, but, after a brief conversation with
Graves, referred him to the defendant Santosuosso to put
the matter through. The connection of Graves with the
cases, as disclosed by the evidence, was so close as to render
it improbable that a corrupt arrangement for the settle-
ment of them would have been made without his participa-
tion in such an arrangement. And there was evidence
which might be believed that Graves had been in the office
of the defendant Curley as mayor, when, before the trial
of the cases, there was talk of settling them. But even if
this defendant did not remember Graves it is not wholly
improbable, upon Graves's mentioning to him the names
of the cases, with respect to which this defendant had
received reports from the corporation counsel, that this
defendant may have thought Graves sufficiently identified
as connected with the cases for this defendant to talk with

him about them and to refer him to the defendant Santosuosso for further action with respect to them.

It would seem that it would have been natural that the amount for which the cases were to be settled should have been named in the conversation. But the circumstances of the conversation, according to the evidence, were not conducive to an agreement upon the precise terms of the settlement and the conversation might reasonably have been regarded as in the nature of preliminary negotiations for a settlement, the precise terms of which should be agreed upon later through the defendant Santosuosso. And it is to be observed that the defendant Santosuosso testified, without contradiction, that after the trial he was authorized by Graves — who purported to represent Ernest W. Brown, Inc., and the General Equipment Corporation — to settle the cases for $120,000 and somewhat later was so authorized to settle them for $100,000. But there is no evidence that the defendant Santosuosso before the conversation in Washington between Graves and the defendant Curley took place had been authorized by Graves to settle the cases for less than $100,000. It is somewhat difficult to understand why Graves, if he had known the facts as to the progress of negotiations between the defendant Santosuosso and the corporation counsel, should have made so large an offer to obtain a settlement through improper means. But though it is apparent from the evidence that Graves knew that the defendant Santosuosso was talking terms of settlement with the corporation counsel it does not appear that Graves knew that a settlement of the cases for $70,000, or a little more, had been proposed by the corporation counsel — as appears from his testimony and the testimony of the defendant Santosuosso. There well may have been doubt in the mind of Graves as to how large a settlement would be recommended by the corporation counsel and as to whether a recommendation by him of a favorable settlement or of any settlement would be approved by the defendant Curley as mayor. In the light of these circumstances it cannot be said that the conversation was so improbable that the

trial judge was plainly wrong in finding that this conversation took place. This conclusion is corroborated by the finding of the trial judge — which is not plainly wrong on the evidence — that although Graves "only paid . . . [$20,000] to his principal, it does not appear that the latter was dissatisfied." And this conclusion is also corroborated — at least against the defendant Santosuosso — by the finding of the trial judge that Graves's "instructions from his principal were that if the case were settled the principal was to get net $35,000." This finding is supported by evidence originally admitted only against the defendant Santosuosso, but counsel for the defendant Curley has based his argument in part upon this evidence and must be taken to have waived the limitation upon its application. However, recognition of the limitation does not vitiate the finding of the trial judge that the conversation took place.

It follows from what has been said that the finding of the trial judge that a conversation between Graves and the defendant Curley, such as is described in the report, took place in Washington must stand.

C. The trial judge in his report of material facts, after stating his finding that the conversation between Graves and the defendant Curley at Washington, recited in this report and previously considered in this opinion, took place, states as a finding of fact that "Graves thereupon returned to Boston and told the defendant Santosuosso the substance of the talk with Curley." This finding is supported by a statement in the affidavit of Graves, previously referred to, in which, after stating the conversation between him and the defendant Curley, which contained the statement, "see Santosuosso and tell him to put it through," Graves said, "I told this to Joseph Santosuosso." The defendant Santosuosso denied that Graves told him of any such conversation with the defendant Curley. However, in accordance with principles already discussed in connection with other findings, the finding of the trial judge, which imports that he believed the evidence of Graves, must stand. It is consistent with the other findings.

D.   The trial judge found "consciousness of guilt on the part of both defendants in that each testified falsely . . . in material particulars." This finding imports that such testimony was wilfully untrue. This is the natural meaning of the word "falsely" used in this connection (see *Hatcher* v. *Dunn*, 102 Iowa, 411, 415; *State* v. *Merlo*, 92 Ore. 678, 688) and the finding of consciousness of guilt imports a finding of facts essential to support it. The finding that the defendants testified "falsely," in this sense, in material particulars is not plainly wrong on the evidence. And from such a finding "consciousness of guilt" was properly inferred. Of course, as has been pointed out many times, disbelief of evidence is not the equivalent of affirmative evidence to the contrary. But where a material fact is established by evidence and it is shown that a defendant's testimony as to that fact was wilfully untrue, this circumstance not only furnishes a ground for disbelieving other testimony of this defendant (*Ducharme* v. *Holyoke Street Railway*, 203 Mass. 384, 397; *Peck* v. *New England Telephone & Telegraph Co.* 225 Mass. 464, 466), but also tends to show consciousness of guilt or liability on his part and has probative force in connection with other evidence on the issue of such guilt or liability. Such false testimony is in the nature of an admission from which with other evidence guilt or liability may be inferred. *D'Arcangelo* v. *Tartar*, 265 Mass. 350, 352. See also *Commonwealth* v. *Trefethen*, 157 Mass. 180, 199. There is nothing in the report of material facts indicating that the trial judge in his findings went beyond a proper application of this principle.

E.   The findings — which must be taken as established — that the conversation between Graves and the defendant Curley in Washington described in the report of material facts took place, that Graves reported this conversation to the defendant Santosuosso, and that the defendant Santosuosso thereafter received $30,000 from Graves out of the $85,000 paid by the plaintiff city to said Santosuosso in settlement of the General Equipment Corporation cases, considered in connection with other facts that are not con-

troverted, lead inevitably to the conclusion that the $30,000
in question was received by the defendant Santosuosso in
pursuance of this conversation and to the conclusion that
there was a corrupt arrangement for the settlement of the
General Equipment Corporation cases in which both the
defendants and Graves participated. According to this ar-
rangement or understanding the defendant Curley author-
ized the settlement of the cases to be made.

9. A further material issue to be determined is whether
the defendant Curley received the $30,000 out of the $85,000
paid by the city in settlement of the General Equipment
Corporation cases.

The trial judge found that the entire proceeds of the
$30,000 check "were turned over to the defendant Curley
by the defendant Santosuosso in accordance with the under-
standing whereby Curley as mayor authorized the settle-
ment to be made." He found that "Santosuosso delivered
the proceeds" of the check to the defendant Curley, and
that the $30,000 was "paid in currency to Curley." These
findings are not plainly wrong.

The conversation between Graves and the defendant
Curley in Washington, including the direction by this
defendant to Graves to "see Santosuosso and tell him to
put it [the settlement of the General Equipment Company
cases] through," the report of this conversation by Graves
to the defendant Santosuosso, the putting through of the
settlement of these cases by the defendant Santosuosso
about two weeks after the conversation, the receipt by the
defendant Santosuosso of a suspiciously large amount of
money in bills and the consciousness of guilt on the part of
each defendant — facts which must be taken to be estab-
lished — support by reasonable inference the conclusion
that the defendant Santosuosso paid this amount of money
in currency to the defendant Curley in general, though not
exact, conformity with the terms of the conversation. It
was not plainly wrong for the trial judge to conclude that
this was a more probable disposition by the defendant
Santosuosso of the $30,000 than any other disposition
thereof by him of this money. The burden of proof rest-

ing upon the plaintiff was to show by a preponderance of evidence that the reasonably probable disposition of the $30,000 was the payment thereof by the defendant Santosuosso to the defendant Curley — that there was a greater likelihood of this disposition of the money than of any other. The plaintiff was not bound to exclude all other possible dispositions of the money. *Navien* v. *Cohen*, 268 Mass. 427, 431. *Young* v. *New York, New Haven & Hartford Railroad*, 273 Mass. 567, 570. *Blanchard's Case*, 277 Mass. 413, 415. *Schaefer* v. *Holmes*, 277 Mass. 468, 470, 473. *Walker* v. *Benz Kid Co.* 279 Mass. 533, 537. *Sargent* v. *Massachusetts Accident Co. ante*, 246, 250. The trial judge was not plainly wrong in finding that the burden was sustained. Moreover, as against the defendant Santosuosso, the conclusion that the $30,000 was paid by him to the defendant Curley is corroborated by the statement in the affidavit of Graves — not admitted in evidence against the defendant Curley — that said "Santosuosso immediately thereafter told me that he did give this money to Mayor Curley."

The finding that the $30,000 was paid by the defendant Santosuosso to the defendant Curley must stand. But this finding is not essential to support the decree against the defendant Curley. On other findings in the case that are not plainly wrong the $30,000 was received by the defendant Santosuosso in pursuance of a conspiracy to obtain money in breach of the defendant Curley's fiduciary duty to the plaintiff city, in which conspiracy both these defendants participated as coconspirators. The defendant Curley was liable for the act of his coconspirator, the defendant Santosuosso, in receiving the $30,000, "in pursuance of the conspiracy by which the wrong was finally accomplished." *General Mortgage & Loan Corp.* v. *Guaranty Mortgage & Securities Corp.* 264 Mass. 253, 260. Consequently, the defendant Curley was chargeable as trustee for the plaintiff of the money so received by the defendant Santosuosso, irrespective of whether it was actually paid by this defendant to the defendant Curley. On a third ground the defendant Curley was liable for the $30,000. Findings of the trial

judge that are not plainly wrong show that the defendant Santosuosso was the ostensible agent of the defendant Curley to receive the $30,000. Receipt of this money by the defendant Santosuosso as such agent, was, in legal effect, receipt of such money by the defendant Curley. There is no inconsistency in these defendants being co-conspirators and the defendant Santosuosso being an agent of the defendant Curley. "A co-conspirator may be the agent of another co-conspirator." *Dolan* v. *Commonwealth*, 304 Mass. 325, 339. See also *Hyde* v. *United States*, 225 U. S. 347, 367–368.

10. Upon the evidence and the findings of the trial judge supported thereby, which cannot be reversed by this court, and the principles of law decided in the case when it was here before and previously stated in this opinion, the defendant Curley, by reason of the breach of his fiduciary duty as mayor of the plaintiff city, became chargeable as trustee for the plaintiff at least of the $30,000 received by him from the defendant Santosuosso, and the decree was right in ordering the defendant Curley to pay to the plaintiff this amount with interest thereon computed at the rate of six per cent per annum from November 28, 1933.

11. Upon the evidence and the findings of the trial judge supported thereby, which cannot be reversed, and the principles of law decided when the case was here before and stated previously in this opinion, the defendant Santosuosso by reason of his participation in the breach by the defendant Curley of his fiduciary duty to the plaintiff city (*Warren* v. *Para Rubber Shoe Co.* 166 Mass. 97, 103; *Boston* v. *Santosuosso*, 298 Mass. 175, 181) became chargeable as trustee for the plaintiff at least of the $20,000 received by him "ostensibly as his fee and reimbursement for his expenditures in the cases," and the decree was right in ordering the defendant Santosuosso to pay to the plaintiff this amount with interest thereon at the rate of six per cent per annum from November 28, 1933.

Sixth. The motion of each defendant for a rehearing was based on the alleged ground of newly discovered evidence. The trial judge heard these motions on affidavits and oral

testimony.   The  defendant  Santosuosso — but  not  the
defendant  Curley — appealed  specifically  from  the  denial
of his motion for a rehearing.  The defendant Santosuosso
refers in his brief to the matter of the denial of the motion
by way of statement rather than of argument.  The question
of the  propriety  of  the  denial,  therefore,  perhaps  might
properly  be  treated  as  waived  by  this  defendant.  *Common-
wealth* v. *Dyer*, 243 Mass. 472, 508.  *Mullen* v. *Sewer Com-
missioners of Milton*, 280 Mass. 531, 537.  *Boston* v. *Dolan*,
298 Mass. 346, 355–356, and cases cited.  But even if this
question is not treated as waived no error in the disposition
of the  motion  appears.  A motion for a rehearing on the
ground of newly discovered evidence is addressed to the
sound  discretion  of  the  trial  judge.  *Berggren* v. *Mutual
Life  Ins.  Co.* 231 Mass. 173, 176–177, and cases cited.
*Norcross* v. *Haskell*, 262 Mass. 568, 570.  *Macomber*  v.
*King*, 288 Mass. 381, 383.  *Johnson* v. *Johnson*, 300 Mass.
24, 28.  Though in an equity case the exercise of discretion
by a trial judge is reviewable by this court on appeal, there
can be no reversal of the action of the trial judge except for
error of law or fact shown by the record on appeal, and some
weight must be given to the exercise of discretion by the
trial judge.  *Long* v. *George*, 296 Mass. 574, 579.  No such
error is shown by the record.  The trial judge was not bound
to believe the affidavits or the oral testimony.  See *Com-
monwealth* v. *Millen*, 290 Mass. 406, 410, and cases cited;
*Johnson* v. *Johnson*, 300 Mass. 24, 28.  *Carilli* v. *Hersey*,
300 Mass. 329, 331.  In reports of material facts relating to
these motions respectively, he states that he did not believe
"either the affidavits or the oral testimony produced in sup-
port of the gist of the motion."  He was not plainly wrong
in disbelieving them.  Whether, if he had believed them, the
denial of the motion would have been an erroneous exercise
of discretion need not be considered.  See *Graustein, peti-
tioner*, 305 Mass. 571, 572, and cases cited.  What has
been said here disposes also of the matter of the denial
of the motion of the defendant Curley for a rehearing —
which has been argued by him — even if we assume in his
favor that the matter is before us on his appeal from the

final decree. See G. L. (Ter. Ed.) c. 214, § 27; *Smith* v. *Knapp*, 297 Mass. 466, 467.

It follows that the final decree must be affirmed. The decree after rescript will of course bring up to its date the computation of interest. *Rudnick* v. *Rudnick*, 281 Mass. 205, 208. *Boston* v. *Dolan*, 298 Mass. 346, 352.

> *Decrees denying motions for the framing of jury issues affirmed.*
>
> *Decrees denying motions for rehearing affirmed.*
>
> *Final decree affirmed with costs.*